

**FILED**

**AUG 1 8 2014**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD E. LEHNE,<br>1619 Willow Dale Lane,<br>Charlottesville, Virginia 22911<br><br>        Plaintiff,<br><br><br>    v.<br><br><br>GEORGIA-PACIFIC LLC, a Georgia<br>Corporation, individually and as successor-<br>in-interest to Bestwall Gypsum Company,<br>133 Peachtree Street, NE,<br>Atlanta, Georgia 30303;<br><br>METROPOLITAN LIFE INSURANCE<br>COMPANY, a New York Corporation,<br>One Metlife Plaza, 2701 Queens Plaza N,<br>Long Island City, NY 11101;<br><br>HONEYWELL INTERNATIONAL, INC.,<br>a Delaware Corporation,<br>individually and as successor in interest to<br>Bendix and Allied Signal,<br>101 Columbia Road and Park Avenue, P.O.<br>Box 1057-Tax Dept., Morristown, New<br>Jersey 07962;<br><br><br>UNION CARBIDE CORPORATION,<br>a New York Corporation, 39400 W. Sam<br>Houston Parkway South, Houston, Texas<br>77042.<br><br>Defendants | COMPLAINT AND JURY TRIAL DEMAND<br><br><br>Case: 1:14-cv-01410     **JURY**<br>Assigned To : Walton, Reggie B.   **DEMAND**<br>Assign. Date : 8/18/2014<br>Description: PI/Malpractice |

1

## CIVIL ACTION COMPLAINT

PLAINTIFF, Richard E. Lehne, by and through his attorneys, Motley Rice, LLC, hereby bring this Civil Action Complaint for personal injuries, specifically mesothelioma, suffered as a result of Defendants' wrongful conduct, whereof the following is a statement:

## JURISDICTION AND VENUE

1.    This Court has personal jurisdiction over the Defendants because the Defendants are duly licensed to do business in the District of Columbia and/or at all material times are or have been engaged in business in the District of Columbia, and/or have otherwise purposefully availed themselves of the District of Columbia.  .

2.    Each defendant is amenable to suit in the District of Columbia by reason of having sold, distributed, and/or installed asbestos-containing products in the District of Columbia or by reason of having placed the same into the stream of commerce for use in District of Columbia, and/or by reason of transacting business in the District of Columbia, and/or by reason of having committed tortious acts against the Plaintiff in this District and other states in addition to Defendants' other general construction product or automotive product or other business sales.

3.    This Court has personal jurisdiction over Defendants in this matter pursuant to the applicable District of Columbia Long Arm Statute, D.C. Code Ann. § 13-423 et seq.

4.    Further, pursuant to 28 U.S.C. §1332 this Court has diversity jurisdiction over the parties because the Plaintiff is a citizen of the Commonwealth of Virginia and none of the Defendants are citizens of the Commonwealth of Virginia. The amount in controversy exceeds

Seventy Five Thousand Dollars ($75,000.00).

5.      Pursuant to 28 U.S.C A. §1391 (b), venue is proper in this judicial district because a substantial part of the events or omissions occurred in the District of Columbia and because Defendants are subject to the court's personal jurisdiction by virtue of their product sales and contacts within the District of Columbia.

## PARTIES

6.      Plaintiff, Richard E. Lehne (hereinafter "Plaintiff'), is a citizen and resident of the Commonwealth of Virginia, residing at 1619 Willow Dale Lane, Charlottesville, Virginia 22911. Mr. Lehne is an author of a pharmacology textbook used for the training of nurses throughout the United States and a real estate investor/manager who has for over 40 years focused his efforts on buying residential properties, refurbishing them, and then selling or renting them to third parties.  Refurbishing work was done by the Plaintiff in the District of Columbia and this work caused him to come into contact with defendants' asbestos containing products and asbestos dust.   Plaintiff also enjoyed working on automobiles and motorcycles and while working on asbestos containing brakes, clutch and gaskets breathed dangerous asbestos dust.

7.      Plaintiff brings this action for monetary damages as a result of Plaintiff contracting an incurable asbestos cancer he was diagnosed with as a result of breathing asbestos dust. Plaintiff was diagnosed with Malignant Mesothelioma, a signal tumor for exposure to asbestos, in July, 2014. Mr. Lehne was exposed to asbestos dust as a result of using Defendant Georgia Pacific's asbestos containing joint compound in various locations in the District of Columbia during the 1960s and 1970s.  The activities of mixing, sanding, and sweeping that

accompanied the remodeling process exposed him to great quantities of asbestos dust.   Mr.

Lehne was also exposed to asbestos as a result of doing automotive brake repair work using

asbestos containing brakes manufactured by defendant Honeywell, as successor to Bendix.

During the time period that Mr. Lehne was exposed to asbestos, the manufacturers of asbestos

products failed to adequately warn of the lethal hazards of breathing asbestos dust, often failing

to issue any waning at all, despite the fact that these asbestos companies knew that breathing

asbestos dust could be fatal.   When the asbestos dust is breathed in, it can cause asbestos cancer

decades later.   The scientific and regulatory communities around the world are in unanimous

agreement that all types of asbestos released from asbestos products, including chrysotile

asbestos, cause cancer, and that there is no safe level of exposure to asbestos.   Investigation

continues into Mr. Lehne's residence and work with and around asbestos products and his

exposures to those products.   At present, Mr. Lehne's only known exposures to asbestos

occurred as a result of using asbestos containing joint compound and automotive (brake)

products.

8.       Defendant Georgia Pacific is a Georgia corporation authorized to transact

business in the District of Columbia, that sold, installed and distributed asbestos containing

products including asbestos containing all purpose joint compound, Ready Mix, Bedding

compound, Central Mix, Drywall adhesive, Kalite, Laminating compound/Ready-Mix, Lite

Acoustic, Patching Plaster, Spackling Compound, Speed Set/One Day, Texture Topping

Compound, Triple Duty Joint Compound, and other re-branded products and has its principal

place of business at 133 Peachtree Street, NE, Atlanta, Georgia 30303.   Georgia Pacific

Corporation began manufacturing many of these products in 1965 when it purchased the

Bestwall Gypsum Company. Bestwall Gypsum Company had been manufacturing and distributing many of these same products from 1956 until its sale in 1965. The installation, removal and manipulation of these products created asbestos dust to which the Plaintiff was exposed.

9. Defendant Honeywell International, Inc., f/k/a Allied Signal, Inc., successor in interest to the Bendix Corporation, is a Delaware Corporation authorized to do business in the District of Columbia, that manufactured, produced, sold, distributed and/or supplied, either directly or indirectly, to Plaintiff, asbestos-containing products, and has its principal place of business at 101 Columbia Road and Park Avenue, P.O. Box 1057-Tax Dept., Morristown, New Jersey 07962. Upon information and belief, Defendant Honeywell International, Inc., f/k/a Allied Signal, Inc., successor in interest to the Bendix Corporation, is responsible for asbestos containing automotive friction materials used by the Plaintiff in the maintenance and repair of Plaintiff's personal vehicles and other vehicles on which he worked. The installation, removal and manipulation of these products created asbestos dust to which the Plaintiff was exposed.

10. Defendant Metropolitan Life Insurance Company ("Met Life") is a New York Corporation authorized to do business in the District of Columbia and has its principal place of business at One Metlife Plaza, 2701 Queens Plaza N, Long Island City, NY 11101. Upon information and belief, MetLife is an insurance company that wrote policies that would have faced exposure to asbestos liability. MetLife funded scientific research into the health effects of asbestos. Upon learning the results of that information, MetLife conspired with various manufacturers of asbestos-containing products to conceal the results of the studies and to conceal the truth about asbestos from the public.

11.     Defendant Union Carbide Corporation is a New York Corporation authorized to do business in the District of Columbia, that sold, installed and distributed asbestos-containing products, including, but not limited to General Purpose Bakelite, Heat Resistant Bakelite, High Impact Heat Resistant Bakelite, Bakelite Molding Compound, electrical products and plasters to the Plaintiff or to the sites at which he worked, and has its principal place of business at 39400 W. Sam Houston Parkway South, Houston, Texas 77042. This Defendant also sold and/or distributed bulk quantities of raw asbestos fibers mined from the Calidria Mines, to many of the defendants listed herein, for incorporation into their asbestos-containing products under various trade names. In particular, this Defendant sold and/or distributed thousands of tons of raw asbestos fibers to Georgia-Pacific Corporation and United States Gypsum for use in fabricating many of their asbestos-containing joint compounds and spackling products under various trade names. Upon information and belief, Union Carbide mined Calidria asbestos which was used in various applications, including drywall, joint compound, and other products.   Upon further information and belief, Defendant Union Carbide also manufactured a product called Bakelite, which contained asbestos fibers and was used in various electrical applications, including but not limited to panel and control boxes manufactured by GE, Westinghouse, Square D, Cutler Hammer, Allen Bradley, and others.  The installation, maintenance, and removal of these asbestos products produced asbestos dust to which the Plaintiff was exposed.

12.     All of the named defendants listed on the caption and in Paragraphs 8 to 11 above are foreign corporations who are amenable to jurisdiction in the District of Columbia by virtue of their respective conduct of substantial and/or systematic business in the District of Columbia and as a result of their activities which subject them to the jurisdiction of the District of Columbia

courts pursuant to the District of Columbia Long-Arm Statute. Each defendant corporation, with the exception of Met Life, does or in the past mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, which are or in the past were sold, distributed, and used in District of Columbia. Met Life is subject to jurisdiction in this District as a result of its activities which affected asbestos victims in every state and jurisdiction in the United States as described in more detail below. The plaintiff was exposed to various asbestos-containing products while living or working at various locations in the District of Columbia.

## COUNT I (NEGLIGENCE)

13.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

14.     At all material times, Defendants, with the exception of Met Life, are or were miners, manufacturers, distributors, processors, importers, converters, compounders, and/or retailers of asbestos and/or asbestos-containing products, materials or equipment.

15.     Each of the defendants named in the caption above conducted business in the District of Columbia, has produced, manufactured or distributed asbestos and/or asbestos products with the reasonable expectation that such products were so used or consumed, and/or has committed the tortuous acts set forth below.

16.     The Defendants, acting through their agents, servants, and/or employees caused, and have caused in the past, certain asbestos and asbestos-containing materials, products or equipment to be placed in the stream of interstate commerce with the result of that said asbestos

and asbestos-containing materials, products or equipment came into use by the Plaintiff.

17. The dangers of breathing asbestos were first published in the medical literature in the 1890s. By the 1930s there were numerous articles in the medical literature that demonstrated that breathing asbestos dust could cause fatal diseases. By the late 1950s, there were hundreds of medical articles highlighting the dangers of being around asbestos dust. By the early to mid 1960's all of the named defendants were aware that breathing asbestos dust from the use of their products could cause fatal diseases, including cancer and mesothelioma. Confidential corporate documents from the named defendant companies reveal that (a) the dangers of asbestos were well understood; (b) asbestos was cheaper to use in the products than replacement substances such as clay; (c) the product manufacturing industry actively fought governmental regulation and the banning of asbestos. Examples of documents from the files of Defendants Georgia Pacific, Honeywell/Bendix, and Union Carbide evidencing that they clearly understood the hazards posed by their asbestos or asbestos containing products are attached hereto and incorporated by reference as Exhibits A, B, and C. To this day industry has been successful in their lobbying efforts to keep asbestos legal in the United States.

18. Beginning in the late 1960s through the late 1970s Plaintiff worked with and/or was exposed to the asbestos and asbestos-containing materials, products or equipment mined, manufactured, processed, imported, converted, compounded, and/or sold by the Defendants. Investigation is ongoing, but upon information and belief, most of Plaintiff's exposure to asbestos occurred within the District of Columbia.

19. During the course and scope of his work with and around asbestos containing products, Plaintiff was exposed to Defendants' asbestos and asbestos-containing materials,

products or equipment, which exposure directly and proximately caused him to develop an illness known and designated as Mesothelioma.

20.    Defendants, acting by and through their servants, agents and employees, duly authorized and acting within the scope and authority of their employment, had a duty to design, manufacture and sell products that were not unreasonably dangerous or defective and/or a duty to warn the Plaintiff and foreseeable users of said products of the dangers and defects which the Defendants created, knew, had reason to know, or, within the exercise of reasonable care, should have known.

21.    Plaintiff worked with and around asbestos and/or asbestos-containing products, materials or equipment that were manufactured, processed, distributed, supplied and/or sold by Defendants during various renovations of homes in the District of Columbia, and through brake work on vehicles in the District of Columbia.  Defendants knew, had reason to know, or should have known that persons in the position of Plaintiff would come into contact with and would work in close proximity to said products, and breathe the asbestos dust emanated from such products during their intended and reasonably foreseeable uses.

22.    Plaintiff sustained injuries caused by no fault of his own and which could not be avoided through the use of his reasonable care largely because Defendants failed to adequately warn of asbestos dangers or advise of safe work practices. Plaintiff's development of an asbestos-related disease was directly and proximately caused by the negligence and carelessness of defendants in that they manufactured, processed, sold, supplied or otherwise put said asbestos or asbestos-containing products, materials or equipment, into the market and into the stream of interstate commerce, while they knew, had reason to know, or in the exercise of ordinary care

should have known, that said products were deleterious, poisonous, cancer-causing and/or inherently dangerous and harmful to Plaintiff's body, lungs, respiratory system, skin, health, and general well-being. Further, defendants knew, had reason to know, or in the exercise of reasonable care should have known that Plaintiff would not know of such danger to his health.

23.     Plaintiff's illness and disability are the direct and proximate result of the negligence and carelessness of defendants, jointly and severally, in that, even though the defendants knew, had reason to know, or in the exercise of ordinary care should have known, that the asbestos and asbestos-containing materials, products or equipment were deleterious, poisonous, and highly harmful to Plaintiff's body, lungs, respiratory system, skin, and health, they failed to adequately warn of such hazards and/or failed to make their products with substitutes for asbestos.

24.     The actions of the Defendants described and alleged above were negligent and wrongful in one or more of the following ways:

(a)     Their asbestos-containing products were unreasonably defective in one or more of the following ways:

1.     in that said products were and are unavoidably unsafe, and failed to carry proper, adequate and correct warnings about their asbestos dust hazards about which the defendants knew, had reason to know, or should have known;

2.     in that said products were and are unreasonably dangerous, in that they were and are dangerous to an extent beyond that which the ordinary worker or bystander in the position of the plaintiff would contemplate;

3.     in that any warnings, information and/or safety instruction said products may have carried, were improper and inadequate in that they failed to apprise users and/or others, including the plaintiff, adequately and reasonably of the full hazards and dangers of coming in contact with said products, including the risk of cancer and death;

(b)    The defendants knew, had reason to know, or should have known that said asbestos-containing products were inherently dangerous to those who used them, yet the defendants failed to use reasonable and/or ordinary care in seeing to it that said products carried proper, adequate and correct warnings of the dangers of said products, and the exposure of the plaintiff and others like the plaintiff to these products was reasonably foreseeable to the defendants.

## COUNT II – LIABILITY FOR DEFECTIVE PRODUCT

25.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

26.    Defendants, at the time of designing, manufacturing, distributing, selling, or otherwise placing asbestos and/or asbestos-containing products, materials or equipment into the stream of commerce, knew, had reason to know, or in the exercise of reasonable care, should have known about the risks associated with their products. The products in question were defective at the time they left the control of the Defendants.

27.    Defendants were negligent and breached their duty of due care to Plaintiff by taking or failing to take the actions as previously alleged to avoid harm to the Plaintiff and other foreseeable users, in light of the reasonably foreseeable dangers caused by the design, manufacture, sale, distribution of the asbestos and/or asbestos-containing products, materials or equipment at issue in the stream of commerce.

28.    The hazards posed by exposure to asbestos and/or asbestos-containing products, materials or equipment and the resulting injuries and damages to Plaintiff were reasonably foreseeable, or should have been reasonably foreseen by Defendants.

29.    As a direct and proximate result of the aforesaid negligent acts and/or omissions by the Defendants, the Plaintiff developed Malignant Mesothelioma, as a consequence of which,

through no fault of his own, he is severely injured, disabled and damaged.

30.     The Defendants, with the exception on MetLife, were all miners, manufacturers, sellers, users, distributors and/or suppliers of asbestos products and were engaged in the business of using, manufacturing or facilitating the manufacture of asbestos products, or representing themselves as manufacturers of asbestos products, or were professional vendors of asbestos or asbestos-containing products, which were expected to and did reach, including but not limited to, each of the locations where Richard E. Lehne was exposed.

31.     At all times material hereto, the Defendants knew, had reason to know, or should have known of the harmful effects and/or harmful dangers of working with asbestos and/or asbestos-containing products, materials, or equipment and that exposures to inhalable asbestos.

32.     Defendants had a duty to warn individuals working at the Plaintiff's jobsites, including but not limited to Plaintiff, of the dangers associated with the use and/or inhalation of asbestos dust and fibers.

33.     Despite Defendants' knowledge of the harm and/or potential harm associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment, the Defendants failed to warn and/or inadequately warned Plaintiff of the dangers of asbestos and asbestos dust.

34.     The products mined, manufactured, sold, distributed, supplied and/or used by these defendants were defective, unreasonably dangerous, and unreasonably dangerous per se, to Plaintiff who was an intended and foreseeable user and bystander who was exposed to these products.  These defects include, without limitation, the following:

(a)     The mining, manufacture, sale, supply, distribution and use of products that are unreasonably dangerous, or unreasonably dangerous per se;

(b)     The mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting high potential for causing serious injury, such as respiratory disease, cancer, and other health problems to the Plaintiff who would be foreseeably exposed to them in as a result of their intended use;

(c)     The lack of warning or of sufficient warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

(d)     Failing to provide adequate cautions, warnings, and/or hazard statements and/or explanations with its products which should have been designed to provide to the Plaintiff knowledge about the hazards caused by exposure to their products and how to eliminate such hazards;

(e)     Failing to provide adequate product inserts, informative brochures, employee training literature, posters, safety instructions and/or other written materials with their products which should have been designed to provide to the Plaintiff knowledge about the hazards caused by exposure to its products and how to eliminate such hazards;

(f)     Failing to conduct on-site personnel training sessions with exposed workers which should have been designed to provide to the workers knowledge about the hazards caused by exposure to the products, and how to eliminate the hazards;

(g)     Failing to adequately test and research their products as to the hazards created during their use and failed thereafter to provide the results of such tests and research to the intended or forseeable users of exposed individuals such as Plaintiff;

(h)     Failing to inspect workplaces in which their products were being used to determine whether the products being used were deleterious to the health of exposed workers or individuals;

(i)     Failing to inspect their products to assure sufficiency and adequacy of warnings and safety cautions;

(j)     Failing to design, process and transport their products in a manner intended to minimize exposure during normal working conditions;

(k)     Failing to properly design their products when the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

(l)     Failing to specify and market their products on the express agreement that

necessary engineering controls, work practices, and other industrial hygiene controls would be implemented in conjunction with use of the products after it was known or should have been known that adequate protective measures were not being implemented;

(m)     Failing to recall their defective product or manufacture a reasonably safer alternative;

(n)     Failing to properly package their products so that they could be safely transported, handled, stored or disposed of;

(o)     Failing to take adequate precautions and industrial hygiene measures to protect Plaintiff and exposed workers when installing, repairing, or tearing out asbestos and/or asbestos-containing products, materials, or equipment including, but not limited to, providing protection from dust and fibers emanating from the installation, repair, and/or removal process; failing to use local ventilation; failing to provide warnings to Plaintiff and workers in the facilities at issue that exposure to dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment was hazardous and carcinogenic; failing to adequately clean up debris from the installation, repair and/or removal process; failing to use wet down procedures; and/or failing to take other appropriate safety and industrial hygiene measures;

(p)     Otherwise failing to act reasonably under the totality of the circumstances.

35.     Defendants manufactured, processed and/or sold asbestos and/or asbestos-containing products and materials, and these products were used by Plaintiff and others in his presence. Thus, Defendants had a duty to warn individuals, including but not limited to the Plaintiff, of the dangers associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment.

36.     Despite Defendants' knowledge of the harm and/or potential harm associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment, the Defendants acted unreasonably in failing to provide adequate warnings and/or instructions as to the hazards associated with exposure to asbestos and/or asbestos-containing products, materials, or equipment.

37.     At the time the asbestos and/or asbestos-containing products, materials, or equipment left Defendants' control without adequate warning or instruction, Defendants created an unreasonably dangerous condition that it knew, had reason to know, or should have known would pose a substantial risk of harm to a reasonably foreseeable claimant, such as the Plaintiff. In the alternative, after the asbestos-containing products left Defendants' control, Defendant became aware of or in the exercise of ordinary care should have known that their product posed a substantial risk of harm to a reasonably foreseeable user or bystander, such as the Plaintiff, and failed to take reasonable steps to give adequate warning or instruction or to take any other reasonable action under the circumstances.

38.     The defendants breached their duties to the Plaintiff by:

(a)     failing to warn the plaintiff of the dangers, characteristics, and/or potentialities of the product or products when they knew, had reason to know, or should have known that the exposure        to the product(s) would cause disease and injury;

(b)     failing to warn the plaintiff of the dangers to which the plaintiff was exposed when they knew, had reason to know, or should have known of the dangers;

(c)     failing to exercise reasonable care to warn the plaintiff of what would be safe, sufficient, and properly protective clothing, equipment, and appliances when working with, near or during exposure to asbestos and asbestos products;

(d)     supplying asbestos or asbestos products that were packaged, bagged, boxed and/or supplied to the plaintiff in packaging, bagging, boxes or other containers that were inadequate and/or improper;

(e)     supplying asbestos or asbestos products that were delivered to and reached the plaintiff without adequate or proper handling instructions, face masks and/or respirators;

(f)     failing to test the asbestos and asbestos products in order to ascertain the extent of dangers involved upon exposure;

(g)     failing to conduct such research that should have been conducted in the exercise of reasonable care in order to ascertain the dangers involved upon exposure;

(h)     failing to remove the product or products from the market when the defendants corporations knew, had reason to know, or should have known of the hazards of exposure to asbestos and asbestos products;

(i)     failing upon discovery of the dangers, hazards, and potentialities of exposure to asbestos adequately to warn and apprise the plaintiff of the dangers, hazards, and potentialities discovered;

(j)     generally using unreasonable, careless, and negligent conduct in the contracting for, mining, milling processing, manufacturing, designing, testing, assembling, fashioning, fabricating, packaging, supplying, distributing, delivering, marketing, and/or selling of their asbestos and asbestos products.

39.     Defendants' failure to provide adequate warnings as to the hazards associated with exposure to asbestos and/or asbestos-containing products, materials, or equipment or to provide proper instructions on the use, handling, and storage of asbestos and/or asbestos-containing products, materials, or equipment caused Plaintiff to develop Malignant Mesothelioma as a consequence of which he has been injured and damaged and claims damages of the Defendants jointly and severally in negligence and strict liability.

40.     The defective conditions of Defendants' products and fault, as noted above, are a proximate cause of Plaintiff's injuries complained of herein.

41.     Plaintiff and others in his position worked in close proximity to the asbestos and asbestos-related materials use or manufactured by the Defendants, and the exposure and hazard to each of them, in Plaintiff's presence, as well as others in his position, was known, or in the exercise of reasonable care should have been anticipated by the Defendants.

42.     As a result of the Defendants' failure to warn, the Plaintiff suffered and will continue to suffer the following injuries and damages hereinafter alleged.

## COUNT III
## BREACH OF IMPLIED WARRANTY

43.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

44.     Defendants impliedly warranted that said asbestos materials were of good and merchantable quality and fit for their intended use.

45.     The implied warranty made by Defendants that the asbestos and asbestos-containing materials, products, or equipment were of good and merchantable quality and for the particular intended use was breached and that certain harmful, poisonous, and deleterious matter was given off into the atmosphere wherein Plaintiff carried out his duties while working with or in the vicinity of asbestos and asbestos-containing materials, products, or equipment.

46.     As a direct and proximate result of the breach of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiff developed an illness, to-wit: Mesothelioma.

47.     As a result of the above, Plaintiff seeks damages as are hereinafter demanded.

## COUNT IV
## GROSS NEGLIGENCE-WILFUL, WANTON, AND RECKLESS CONDUCT

48.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

49.     Plaintiff and others in his position worked in close proximity to the

asbestos and asbestos-related materials use or manufactured by Defendants, and the exposure and hazard to each of them, in Plaintiff's presence, as well as others in his position, was known, or in the exercise of reasonable care should have been anticipated, by Defendants, and each of them.

50.     Defendants have known or should have known since at least 1929, and possibly as early as 1890, of medical and scientific data which clearly indicates that the products, asbestos and asbestos-containing products, were hazardous to the health and safety of Plaintiff and others in Plaintiff's position, and prompted by pecuniary motives, Defendants, individually and collectively, ignored and failed to act upon said medical and scientific data and conspired to deprive the public, and particularly the users, of said medical and scientific data, depriving them, therefore, of the opportunity of free choice as to whether or not to expose themselves to the asbestos products of said defendants. As a result, Plaintiff has been severely damaged as is set forth below.

51.     Defendants intentionally and fraudulently continued to conceal the dangers of asbestos exposure from 1929 through the 1970s, thus denying Plaintiff the knowledge with which to take necessary safety precautions such as periodic x-rays and medical examinations, stop smoking, and avoiding further dust exposure. Specifically, Defendants' intentional and fraudulent conduct included the following acts and omissions:

(a)     failure to warn prior users when Defendants had knowledge of the need for monitoring due to prior exposure;

(b)     frustrating the publication of articles and literature from the 1930's through at least 1976;

(c)     rejection by top management of advice of corporate officials to warn of the hazards of their asbestos products; such rejection being motivated by the possibility of adverse effects on profits; and

(d)     The intentional inadequacy of (and delay in the use of) the warnings on asbestos products.

52.     The acts of Defendants, and each of them, as hereinabove set forth were intentional and willful and done with willful disregard of the safety of Plaintiff and others similarly situated at a time when defendants, and each of them, had knowledge, or should have had knowledge of the dangerous effect of asbestos and asbestos-containing materials, products or equipment upon the body of human beings, including Plaintiff and others similarly situated, and even though forewarned by tests, standards, promulgations of rules and regulations, statutes, and ordinances recognized by Defendants and subscribed to by them, nevertheless placed into the stream of commerce, for their own profit, this dangerous asbestos material with full knowledge that it was being used and would be used in the future to the detriment of the health of Plaintiff and others similarly situated, and Plaintiff is thereby entitled to punitive damages.

53.     Accordingly, as a result of Defendants' conduct in which they acted in willful, wanton, gross negligence and in total disregard for the health and safety of the user or consumer, such as Plaintiff, Plaintiff therefore seeks exemplary and punitive damages against defendants to punish Defendants for their actions, which were willful, wanton, gross, and in total disregard of the health and safety of the users and consumers of their products.

## COUNT V – CIVIL CONSPIRACY
## AS TO METROPOLITAN LIFE ONLY

54.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

55.     Defendant Metropolitan Life, as specifically identified below, individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with

other asbestos manufacturers and distributors to injure Plaintiff in the following fashion:

56.     Beginning in approximately 1934, conspirator Johns-Manville Corporation, through its agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan, through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Anthony Lanza, Associate Director, Metropolitan Life Insurance Company (insurers of Manville and Raybestos), that Lanza publish a study on lung cancer in which Lanza would affirmatively misrepresent a material fact about asbestos exposure; that is the seriousness of the disease process, lung cancer.   This was accomplished through intentional deletion of Lanza's description of lung cancer as "fatal" and through other selective editing that affirmatively misrepresented asbestos as a disease process less serious that it actually is and was known to be then.   As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935.   The conspirators were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in lawsuits involving Manville, Raybestos and Metropolitan Life, as insurer.

57.     In 1936, conspirators American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company, entered into an agreement with the Saranac Laboratories.   Under this agreement, these conspirators acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and could also control in what form such publications were to occur.   This agreement gave these conspirators power to

affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, the conspirators exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

58.     On November 11, 1948, representatives of the following conspirators met at the headquarter of Johns-Manville Corporation:  American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasby & Mattison Company (then an alter-ego to conspirator Turner & Newall), Raybestos-Manhattan, Inc., Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company and United States Gypsum Company. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

59.     At this November 11, 1948 meeting, these defendants and their representatives decided to exert their influence to materially alter and misrepresent material facts about the substance of research started by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards of dust exposure for asbestos and asbestos products.

60.     At this meeting, these defendants intentionally and affirmatively determined that Dr. Gardner's work should be edited to specifically delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and the critique of the dust standards and then published in the medical literature by Dr. Vorwald. These defendants thereby

fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including Plaintiff.

61.     As a direct result of influence exerted by the above-described conspirators, Dr. Vorwald published Dr. Gardner's edited work in the <u>Journal of Industrial Hygiene</u>, <u>AMA Archives of Industrial Hygiene and Occupational Health</u> in 1951 in a form that stressed those portions of Dr. Gardner's work that the conspirators wished stressed, but which omitted references to human lung cancer and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The conspirators affirmatively and deliberately disseminated this misleading Vorwald publication to university libraries, government officials, agencies and others.

62.     Such action constituted a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

63.     The following conspirators were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National Gypsum Company, and Turner & Newall, individually and successor to Bell Asbestos.  These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Arthur Vorwald in the <u>AMA Archives of Industrial Health</u> in 1951.  Evidence of the Q.A.M.A.'s involvement in this misrepresentation arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated 10/29/47, 11/26/47, 3/8/48, 10/15/48, 3/8/49, 3/21/51 and 9/6/50, and all indicating close monitoring of the editing process of Q.A.M.A.'s representative,

Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

64.     Defendants who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

65.     This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation or whether cancer was related to asbestos. After a preliminary report authored by Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study and it was terminated and never publicly discussed.

66.     As a result of the termination of this study, these defendants fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by conspirators' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., A.J. Lanza, M.D., Vandiver Brown and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, other medical organizations and the general public, including Plaintiff.

67.     Subsequently, the Q.A.M.A. defendant conspirators contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the relationship between asbestos

exposure, lung cancer and lung cancer. In 1957, Drs. Braun and Truan reported to the Q.A.M.A. that lung cancer did increase a worker's chances of incurring lung cancer.

68.     The Q.A.M.A. defendant conspirators/member thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with lung cancer was edited out by agents of the Q.A.M.A. The published version of this study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by Defendant conspirators to be patently false.

69.     By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting a documented finding that lung cancer did increase the risk of lung cancer, these Q.A.M.A. defendant conspirators affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

70.     In approximately 1958, these Q.A.M.A. defendant conspirators publicized the edited works of Drs. Braun and Truan at a symposium in an effort to fraudulently misrepresent to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

71.     The fraudulent misrepresentations beginning in 1946 as elaborated above and continuing with the publication of the 1958 Braun/Truan study influenced the standards set for threshold limit values for development of such standards to fail to lower the threshold limit value because of a cancer risk associated with asbestos inhalation.

72.     In 1967, Q.A.M.A. conspirators determined at their trade association meeting that they would intentionally mislead consumers about the extent of risks involved in inhalation of

asbestos products.

73.     In 1952, a Symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following conspirators were in attendance: Johns-Manville, Turner & Newall, Raybestos-Manhattan, and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance.

74.     At this meeting, the occurrence of lung cancer and lung cancer in product users was discussed and the carcinogenic properties of all fiber types of asbestos were also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort to fraudulently conceal those risks from the public, these defendants conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the conspirators induced Vorwald not to announce the results of his and Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

75.     The following conspirators were members of the Magnesia Insulation Manufacturers Association: Philip-Carey Corporation (predecessor of Celotex) and Johns-Manville.

76.     In 1955, these conspirators caused to be published the MIMA 85% Magnesia Insulation Manual. This manual falsely and fraudulently misrepresented that asbestos-containing products offered no hazard to workers who use these products.

77.     The following conspirators were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos-Manhattan, Johns-Manville, H.K. Porter, Keasby & Mattison, individually and through its alter-ego Turner & Newall and National Gypsum.

78.     In 1947, these conspirators, members of the ATI, received a report from W.C.L. Hemeon regarding lung cancer, which suggested re-evaluation of the then-existing threshold limit values for asbestos exposure.  These defendants caused this report not to be published and thereby, fraudulently concealed material facts about asbestos exposure from the public and affirmatively misrepresenting to the public and class of persons exposed to asbestos that the existing threshold limit value was acceptable.  Thereafter, these defendant conspirators withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of threshold limit values for asbestos exposure.

79.     In 1953, conspirator National Gypsum, through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products.  National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators.

80.     In 1955, conspirator Johns-Manville, through its agent Kenneth Smith, caused to be published in the AMA Archives of Industrial Health, an article entitled "Pulmonary Disability in Asbestos Workers."  This published study materially altered the results of an earlier study in 1949 concerning the same set of workers.  This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

81.     In 1955, the National Cancer Institute held a meeting at which conspirator Johns-Manville, individually and as an agent for other alleged co-conspirators and A. Vorwald, as agent of

co-conspirators, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the conspirators were in secret possession of several studies which demonstrated that positive evidence did exist.

82.    In 1957, these conspirators, members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

83.    In 1964, conspirators who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently discussed by Dr. Irving J. Selikoff.  Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

84.    In 1970, through their agents, defendants, the Celotex Corporation and Carey-Canada, affirmatively misrepresented that it had been in the asbestos business since 1918 and found no reported conditions of lung cancer or lung disease.  This constituted a fraudulent misrepresentation about the material facts known to these defendants.

85.    All conspirators identified above approved and ratified and furthered the previous conspiratorial acts of conspirators Johns-Manville, Raybestos-Manhattan and A.J.Lanza, acting on behalf of Metropolitan Life Insurance Company, and all alleged co-conspirators during the dates and circumstances alleged above, acted as agents and co-conspirators for the other conspirators.

86.    The acts of Defendants' conspirators as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation which proximately caused injury to Plaintiff in the following manner:

87.     The material published or caused to be published by Defendants was false and incomplete in that Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

88.     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended that the publication of false and misleading reports and/or the nondisclosure of documented reports of the health hazards of asbestos: (1) maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;  (2) assist in the continued pecuniary gain of Defendants through the sale of their products; (3) influence in Defendants' favor proposed legislation to regulate asbestos exposure and; (4) to provide a defense in law suits brought for injury resulting from lung cancer and other industrial dust diseases caused by breathing defendants' asbestos-containing products.

89.     Plaintiff reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to continue their exposure to asbestos because they believed it to be safe.

90.     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators intended that Plaintiff rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue their exposure to those products.

91.     Defendants individually, as members of a conspiracy, and as agents of other co-conspirators are in a position of superior knowledge regarding the health hazards of asbestos and

therefore Plaintiff's family, Plaintiff and his wife had a right to rely on the published reports commissioned by Defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

92.     Plaintiff suffered injury as a direct and proximate result of the acts alleged herein.

## PUNITIVE DAMAGES

93.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

94.     As a result of the willful, wanton and gross misconduct and gross negligence of Defendants as alleged herein, the Plaintiff seeks and requests punitive or exemplary damages. Defendants malicious and outrageous disregard for the safety of users of asbestos products, including Mr. Lehne, including but not limited to their intentional concealment of the dangers of asbestos that they knew of yet consciously refused to warn users of those dangers evidences a conscious indifference to the safety and health of users and bystanders of the products they profited from selling. Plaintiff therefore, for the sale of example and by way of punishing defendants, seeks punitive damages, according to proof.     To this day in fact, Defendants Georgia-Pacific, Honeywell and their lawyers continue to manipulate the science regarding their joint compound's or brake's health effects by paying millions of dollars to individuals to 're-create' their asbestos joint compound or brake dust and proclaim the product was actually safe for use and consumption, a contradiction of knowledge they have possessed for decades and a farce for a company that failed to properly test its product during the relevant time period in the 1970s.  Plaintiff therefore, for the sake of example and by way of punishing Defendants, seeks punitive damages, according to

proof. Defendant's acts and omissions constitute misconduct that is grossly negligent, willful, wanton, malicious and/or outrageous.

## DAMAGES

95.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

96.     As a result of the development of asbestos related diseases, Plaintiff has suffered and sustained very serious injuries to his person, to wit: Malignant Mesothelioma, a terminal asbestos cancer.

97.     Plaintiff has further suffered and will suffer great pain, disfigurement, physical impairment, extreme nervousness, and mental anguish as a direct result of the aforesaid injuries.

98.     Plaintiff verily believes that his injuries and illnesses are recurrent in nature and that he will be forced to suffer same for the remainder of his life; that his enjoyment of life has been greatly impaired; that he has suffered substantial lost wages and loss of earning capacity; and further, that his expected life span has been greatly shortened.

99.     Plaintiff alleges that as a result of the aforesaid illnesses, he has been forced to incur large amounts of medical expenses by way of doctor and drug bills and verily believes that he will be forced to incur additional expenses in an effort to treat his illnesses as aforesaid alleged.

100.    Plaintiff requires or will require domestic help and nursing care due to his disabilities and has been or will be required to pay for such domestic help and nursing services.

101.    Prior to the onset of his symptoms, Plaintiff was extremely active and participated in numerous hobbies and activities, and as a result of his illnesses, Plaintiff has been and will be

prevented from engaging in some of said activities which were normal to him prior to developing symptoms from asbestos-related lung disease. Plaintiff has been and will otherwise be prevented from participating in and enjoying the benefits of a full and complete life.

102.    Plaintiff has also suffered, or will likely suffer, lost income as a result of his development of mesothelioma.

WHEREFORE, the Plaintiff verily believes he is entitled to actual damages against the Defendants, jointly and severally, by reason of said negligence, strict liability, gross negligence, breach of warranty, failure to warn and other breaches of duty as alleged herein proximately caused by the fault of the Defendants, and claims lost wages, special damages, pain and suffering, punitive and exemplary damages.

WHEREFORE, the Plaintiff prays for judgment against all Defendants for actual damages, lost wages, special damages, pain and suffering, punitive and exemplary damages in the amount of TWENTY-FIVE MILLION dollars ($25,000,000.00), and punitive damages in an amount to be determined by the trier of fact, plus the costs of this action.

**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Motley Rice LLC

Nathan D. Finch (DC Bar # 438819)
Elizabeth Smith (DC Bar # 994263)
Motley Rice LLC
3333 K Street, NW, Suite 450
Washington DC 20007
(202) 232-5507
nfinch@motleyrice.com

Attorneys for Plaintiff



**GEORGIA-PACIFIC CORPORATION**

COMMONWEALTH BUILDING · PORTLAND, OREGON 97204
TELEPHONE: 228-0801 · TELETYPE: 910-464-5702
AREA CODE: 503 · WESTERN UNION TELEX: 038-661



PLAINTIFF'S
EXHIBIT
A
Lehne

June 9, 1970

Mr. F. J. Rogers, Secretary
Gypsum Association Safety Committee
201 North Wells Street
Chicago, Illinois 60606

Dear Fred:

We believe the attached is of great importance to the Association
and member companies.

You are aware that joint systems contain approximately 5% asbestos,
some mica and the balance is limestone.

Based on threshhold limits adapted by A.C.G.H., mica (when exceed-
ing 5% free silica) can be classed as a respiratory irritant. Asbestos is
very harmful, however we question whether the percentage used in a formula
and after it is mixed in a batch could be considered harmful.

We realize that someone will be the whipping boy, also product
liability will be stressed. It is our opinion that the entire blame can
be placed on the contractor, for not insisting on respirators and dust masks
when sanding. We understand that dust samples will be obtained during a
sanding operation and analysis made of the samples. We question this
approach, the problem would be the large amount of dust, 10 microns or
smaller that is generated by the sanding operation and breathed by the
individual.

We will keep you posted of any other problems that may develope.
In all probability, U. S. Gypsum and National Gypsum have been alerted
and we will be interested in their approach to minimizing the problem.
Please send 500 "Watchful Wally" stickers and bill this office. Thank you.

Sincerely,

M. F. Fink
Safety Supervisor

MFF/ah

Attachment

PLAINTIFF'S
EXHIBIT
WV-03637

PLAINTIFF'S
EXHIBIT
9704.0

GP02 1483



 INTERNAL CORRESPONDENCE

~~REFINED~~ METALS DIVISION                4625 ROYAL AVE. P.O. BOX 323    NIAGARA FALLS NEW YORK

| | | | |
|---|---|---|---|
| (Name) | Mr. W. C. Thurber | Date | May 12, 1975 |
| Division | Metals Division | | |
| Location | 38th Floor - 270 Park Avenue | Originating Dept. - TECHNOLOGY DEPT. EY. | |
| | New York, N. Y.   10017 | | |
| | | Answering letter date | |
| Copy to | Messrs. R. L. Folkman | Subject | Roderman et al.v.Union |
| | R. F. X. Fusaro | | Carbide Corporation et al. |
| | F. H. Larrison | | |
| | J. L. Myers | | |
| | J. J. Welsh | | |

Attached are answers to questions 5 and 8, providing background information in the form of supplemental interrogatories.

Question 8 is specific for "trade" and "product" periodicals.  Unfortunately I can only speak for this location and not for the Corporation.  To list all journals pertinent to asbestos would be almost all published.

Question 5 is ambiguous, and I answered it the best I could without knowing exactly what the question really was.  In the answer to Question 5 I also included the answer to one of Fusaro's throwaways at the end of his letter, i.e. the mill went on stream in October 1963 and up to then we didn't have "products".

Jim Bright first examined asbestos claims in 1957, and we acquired our claims by the end of 1959.  We began process development work in 1959.  Product development came later, probably late 1959.  The attached history should be of interest to the lawyers.

I can't understand how we are involved in this.  The incubation period, or whatever they call the time between exposure and cancerous disease, for meso-thelioma is 20 to 40 years.  Anyone conking out now couldn't relate to us because we didn't ship product until late 1963 or early 1964, and our lawyers should have a cakewalk with the time element.

If you need my credentials for questions 1, 2, and 3 let me know or just bring my biography in American Men of Science up to date.

RJK:MM                                        R. J. Klotzbach
Attach.

RECEIVED

MAY 13 1975

To:     W. C. Thurber                           Roderman et al. v Union
From:   R. J. Klotzbach                         Carbide Corporation et al.
Date:   May 12, 1975


Question 5

The question specifically asks whether we have or have ever had a "research
and product control department". The answer is "no", specifically for the
single department mentioned, and it is unlikely that any industrial organ-
ization has such a singularly-named department.

We have a Technology Department, existing in its present form since 1970,
combining departments, most of which have been in continuous existence since
1955 at various locations. The oldest group, the metallurgical group, has
been in continuous existence since 1917. None of the combined departments
handled asbestos "products" prior to October 1963 when the King City Mill
went on stream, or handled ores prior to 1959.

The Technology Department performs research, development, and engineering
functions with the following functional groups:

                1.   Mineral Science
                2.   Process Development
                3.   Product Development
                4.   Process Engineering
                5.   Project Engineering
                6.   Analytical Laboratory
                7.   Metal Properties Laboratory
                8.   Quality Assurance
                9.   Administration

The present director of the department is Robert J. Klotzbach. The department
provides business relevant mineral research, process and engineering devel-
opment, product development, preliminary engineering and estimates, design
and process engineering, project and construction engineering, plant technical
assistance, technical sales assistance, new product uses, morphological and
metallographic analyses and analytical services, and quality assurance for
new and existing mineral deposits and manufactured chemical and metallurgical
commodities won from these ores and related chemical and special metallurgical
products. It supplies processes, facilities, products, technical services,
capital forecasting and technical problem-solving to the Operating, Marketing,
Exploration, and Mining departments.

Quality assurance is the regulatory process through which we measure actual
product quality performance, by comparing it with standards and acting on the
difference. At this time it consists of a manager, acting alone, who coordi-
nates activities of seven people reporting at the plant and sales level.
Quality assurance has been a continuous function since 1965. Quality assur-
ance applies to all of our manufacturing and milling facilities.

To:     W. C. Thurber                          Roderman et al. v. Union
From:   R. J. Klotzbach                        Carbide Corporation et al.
Date:   May 12, 1975

Question 5 (continued)

A function of the engineering group is to provide a safe working environment,
and design and construct process and plant facilities that equal or exceed
Corporation and OSHA safety standards and exceed mining industry standards
and comply with national, state, and local environmental quality standards.

A separate safety divisional department works outside the technical depart-
ment and relates primarily to in-house safety.

To:     W. C. Thurber                          Roderman et al. v Union
From:   R. J. Klotzbach                        Carbide Corporation et al.
Date:   May 12, 1975


Question 8

We have in the library at Niagara subscriptions to two product research and
trade association periodicals which we have received since 1967:

                    ASBESTOS BULLETIN
                    Bimonthly
                    Science, Technology and Applications of Asbestos-
                        based Materials
                    Printed in-England

                    ASBESTOS
                    Monthly
                    Willow Grove, Pa.

However, asbestos is an industrial mineral, and used in drilling muds, con-
struction, water purification, etc., and constant reference is made to it
in mining journals, chemical abstracts, engineering index, construction
journals, oil and gas journals, sanitary journals, etc., ad infinitum.  We
subscribe to a host of these journals, abstracts, and indices, and have
done so continuously since the Corporation was formed in 1917 at all of
our locations.  In addition the Medical and Toxicology library located in
New York City contains discipline-related journals from 1930 through 1975.

We have been aware of the hazardous potentials of asbestos consistent with
the state of medical and toxicological knowledge at any particular time
and are also aware of the degree of uncertainty, even at the present time,
in defining what constitutes a biological hazard.



PLAINTIFF'S
EXHIBIT
31721.00

PLAINTIFF'S
EXHIBIT
C
Lehne

September 12, 1966

Mr. Noel Hendry
Canadian Johns Manville Co. Ltd.
Asbestos, Quebec
Canada

Dear Noel

Just to be sure you have a copy, an article that appeared in
Chemical Week magazine is inclosed.

So that you'll know that Asbestos is not the only contamination,
a second article from O.P. & D Reporter assess a share of the
blame on trees.

My answer to the problem is: if you have enjoyed a good life
while working with asbestos products why not die from it. There's
got to be some cause.

Director Of Purchases

E. A. Martin

EAM:MAC
ENC:

PLAINTIFF'S
EXHIBIT
WV-0016375

## Taking Giant Steps

Two chemical process companies took giant steps toward diversifying into the oceanography field last week, and two paper companies with combined sales of nearly $1 billion/year reached a tentative agreement to merge.

(1) Bendix Corp. (Detroit) expanded its oceanic activities by acquiring for an undisclosed amount of stock Marine Advisers (La Jolla, Calif.), producer of oceanographic instruments for petroleum and utility companies, state and federal agencies, and firms engaged in scientific programs.

(2) Fluor Corp. (Los Angeles) and B. L. McFarland and Associates (Fort Worth and Midland, Tex.), a group of five companies involved in offshore and onshore drilling operations, have agreed to merge, subject to stockholders' approval. The McFarland group operates five offshore drilling rigs in the Gulf of Mexico.

(3) A tentative agreement to merge has been reached by U.S. Plywood Corp. (New York) and Champion Papers, Inc. (Hamilton, O.). It is subject to both directors' and stockholders' approval. The corporate identities of both companies will be preserved.

## Reducing Gas Rates

The Federal Power Commission has ordered El Paso Natural Gas Co. and Transwestern Pipeline Co. to reduce by $17 million/year the price of natural gas in the southern California market.

The rate cut stems from the July 26 decision in which FPC turned down the application of Gulf Pacific Pipeline Co. (a Tenneco subsidiary) to supply gas to the Los Angeles area (CW, Aug. 6, p. 20). Gulf Pacific last week filed for a rehearing.

El Paso and Transwestern were told they would have to lower their rates to reflect the lower costs resulting from the bigger deliveries possible in the expanded system. At the same time, FPC said it would conduct further proceedings to decide if customers should get additional benefits resulting from more liberal depreciation allowances.

FPC has given the companies 45 days to show cause why the reduction should not take place.

## Sources of airborne asbestos

Asbestos-lined ducts used in centrally air-conditioned buildings.
Asbestos ducts and insulation in home central-heating plants.
Motor vehicle brake linings and clutch plates.
Auto undercoatings.
Asbestos ceiling and floor tiles.
Asbestos shingles and sidings.
Construction and demolition
  Fitting, cutting, and removing asbestos-filled wallboards and floorings, piping and insulation.
Incineration of asbestos-filled scrap.
Improperly filtered effluent from asbestos processing plants.

# Asbestos: Awaiting 'Trial'

The asbestos industry—whose end products are valued at more than $500 million/year—may be in for a shake-up. It could come in the form of federal legislation limiting the use of asbestos, because asbestos has been accused—though not yet "convicted"—as a significant health hazard. Probable contender for asbestos markets: plastics.

Recent studies have convinced U.S. Public Health Service specialists and other medical authorities that about 40% of all Americans have mild, chronic cases of asbestosis, even though most of them never worked directly with asbestos.

Unlike other airborne dust particles, asbestos fibers have the ability—almost as much as activated carbon—to absorb polycyclic hydrocarbons and arsenicals. Furthermore, says USPHS, in the past 30 years the asbestos-related cancer rate has increased sixfold.

The Inferences: While the average asbestos worker is well protected, the man on the street is not. The 3x1-micron asbestos fibers in his lungs can come from a variety of sources (table, above).

And medical experts say there's no way to assess hydrocarbon content in those lung deposits.

American Cancer Society researchers feel certain there is a synergistic relationship among airborne asbestos, smoking and lung cancer. They reason that the nondegradable, hydrocarbon-soaked fibers may well be a constant source of lung irritation.

PHS officials think it may take them up to five years to establish asbestos' true role as an air pollutant. However, Congress may act before the research is finished. Says Representative Robert Watkins (R., Pa.): "We've seen enough evidence already. Asbestos will never get a clean bill of health. With just a little more data we'll move for controls and strict ones."

Some form of asbestos control is in the offing, public health officials are certain, if only part of a larger clean-ambient-air program. However, there is the danger that Congress may enact rigorous controls on the quantity of asbestos that could be used.

In that case both Canada and U.S. asbestos products manufacturers would be hard hit. Of the five forms of asbestos mined today, chrysotile asbestos holds the predominant market position because of its insulating and processing qualities. Canada produces more than 80% of the chrysotile asbestos used in the U.S. In both countries, a number of serious dislocations would occur.

At present, there is no known material that could fill all of asbestos' strategic roles. On the other hand, should federal controls merely call for higher standards for binders and shieldings, that would spark a rise of new products, with plastics taking the lead.

Reason, say industry spokesmen, present polymer technology could easily turn up products to replace asbestos in most end-uses.






## 2 Doctors Report

*10/6/64*
*Times-Union*

# Asbestos Suspected As Cause of Cancer

### By ALTON BLAKESLEE

New York (AP) — Medical specialists pointed a strong finger of suspicion today at asbestos as a cause not only of lung cancer, but also of another extremely rare form of fatal human cancer.

This cancer, known as mesothelioma, involves the lining of the abdominal and chest cavities.

Much of their evidence comes from autopsy studies of men working with asbestos as an insulation material.

But they said it also is possible that dust from products containing asbestos might be exposing people generally to some risk of cancers. How much risk there might be, they said they could not tell.

Asbestos is used not only for insulation but as a flooring material, in automobile brake shoes, and in many other applications. Ordinary wear-and-tear, they said, might release dust into the atmosphere.

### Present Report

The report was presented to the American Public Health Association by Drs. Irving J. Selikoff and Jacob Churg of the Mount Sinai Hospital, New York, and E. Cuyler Hammond, S.C.D., director of statistical research for the American Cancer Society. Dr. Hammond is known for his studies of cigaret smoking in relationship to lung cancer.

Asbestos is a mineral, magnesium silicate, and about 3½ million tons of it are used worldwide each year, they said. In 1935, worldwide useage amount- to about 500 tons, the re-

Tiny, hard particles of asbestos can lodge in the lungs during mining, processing and application of asbestos-containing materials, or possibly from dust raised through normal wear, they said.

### Marked Increase

"We had previously found that lung cancer and possibly gastrointestinal cancer were markedly increased in incidence among asbestos insulation workers," they said.